**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | NO. 4:19-CV-649 |
| | ) | |
| | ) | |
| VS. | ) | Houston, Texas |
| | ) | 11:48 a.m. |
| | ) | |
| GEORGE DANIEL MCGAVITT | ) | OCTOBER 15 2020 |

*******************************************************

**SENTENCING**

**BEFORE THE HONORABLE GRAY H. MILLER**

**UNITED STATES DISTRICT JUDGE**

**VOLUME 1 OF 1**

*******************************************************

This transcript has been furnished at public expense under the Criminal Justice Act and may be used only as authorized by Court Order. Unauthorized reproduction will result in an assessment against counsel for the cost of an original and one copy at the official rate.

General Order 94-15, United States District Court, Southern District of Texas.

* * * * * *

APPEARANCES:

FOR THE GOVERNMENT:

Ms. Sherri Lynn Zack
U.S. Attorney's Office
1000 Louisiana, Suite 2399
Houston, Texas 77002
Tel: 713-567-9374
Email: Sherri.zack@usdoj.gov

FOR THE DEFENDANT:

Mr. Lewis Ashton Thomas
Lewis Thomas Law PC
14027 Memorial Drive, No. 392
Houston, Texas 77079
Tel: 281-513-9880
Email: Lewisthomaslaw@gmail.com

COURT REPORTER:

Ms. Kathleen K. Miller, CSR, RMR, CRR
515 Rusk, Room 8004
Houston, Texas 77002
Tel: 713-250-5087

Proceedings recorded by mechanical stenography.
Transcript produced by computer-assisted transcription.

P R O C E E D I N G S

(Defendant present.)

THE COURT: Thank you. Have a seat, please.

All right. The Court calls Criminal Case 7 -- I'm sorry -- criminal case, 19-649, United States of America vs. George Daniel McGavitt.

MR. THOMAS: Lewis Thomas on behalf of Mr. McGavitt. Good morning, Your Honor.

THE COURT: Good morning, sir.

MS. ZACK: Sherri Zack on behalf of the United States, Your Honor. Good morning.

THE COURT: Good morning, Ms. Zack.

All right. We do have some folks on the telephone who are listening in. I guess for the purposes of the record, we have the victim coordinator, Ms. Miles?

MS. ZACK: Miller.

THE COURT: Miller.

MS. ZACK: Keisha Miller.

THE COURT: Keisha Miller. All right. And we have the victims on the phone as well?

MS. ZACK: And the family, yes.

THE COURT: And the family.

MS. ZACK: And I believe Special Agent Robert Guerra may be on the phone, too. He was the agent here.

THE COURT: Yes, my law clerk says that Special

Agent Guerra is on the phone; and we have Ms. Reyes from probation also on the phone.

All right. So with that, I am going to start.

11:49:52 Mr. McGavitt, this is a sentencing hearing in your case, and I want to start by briefly describing the Court's sentencing procedures.

The U.S. Supreme Court has held in the *Booker* case that the sentencing guidelines are advisory and 11:50:04 not mandatory for judges. *Booker* requires the sentencing court to consider the guideline ranges, but it permits the Court to tailor the sentence in light of other statutory concerns as well.

The Court in the exercise of its 11:50:16 sentencing discretion will rely on the factors set out in Section 3553(a) to fashion an appropriate sentence in your case, to achieve the Congressionally mandated purposes of sentencing as set forth in the Sentencing Reform Act of 1984.

11:50:30 The Court will endeavor to faithfully apply the directives within the guidelines in their entirety to determine the total offense level and the Criminal History Category under the guidelines. Thereafter, the Court will exercise its discretion to 11:50:43 determine the appropriate sentence. In doing so the Court

will give considerable weight to the sentencing range calculated under the guidelines.

Any comments by the Court in the course of this sentencing are not to be construed as an indication that the Court believes that the guidelines are mandatory, or that they constrain the Court's ultimate sentencing discretion.

The standard of proof for factual findings in connection with sentencing is preponderance of the evidence; and in determining whether that standard has been met, a presentence report is generally considered sufficiently reliable to be used by the trial court as evidence in making the factual determinations which are required by the advisory guidelines.

Now, in your case, I have reviewed the presentence report which was prepared by the probation department.

Let's see, Ms. Zack, there are no objections to the presentence report by the government; is that correct?

MS. ZACK: There's no objections, Your Honor. There is a -- a tiny addition to the addendum as to the amount of restitution.

THE COURT: Yes. I saw that. It was filed yesterday, or day before?

MS. ZACK: Yes. And it -- the original amount submitted to probation was $40,333.02.

THE COURT: Yes.

MS. ZACK: That didn't take into account the monies the family expended from 6-19 to 10-20, which is a $517 difference, so the total would now be $40,850.08.

THE COURT: All right. So that's the amount of restitution that's been requested?

MS. ZACK: At this time, yes, Your Honor.

THE COURT: All right. Thank you.

Now, there were objections filed on behalf of the defendant to the presentence report. I have gone through those. I have looked at probation's responses and the government's responses. The first three just dealt with factual issues, which I think have been resolved by the probation department, and have no impact on the guideline calculations.

So four through seven, would you like to say something about those, or would you like to just stand on what you filed?

MR. THOMAS: Judge, you know, we have reviewed the response by the government and probation. We would -- my client is seeking to testify concerning the allegation of sexual assault, which is a significant enhancement. I don't know if the Court wants to hear evidence.

In regards to our written motion, or written objections, he certainly urges to the Court that he did not -- he did travel to Arkansas for the purpose of meeting with the complainant in this case. He acknowledges that. He certainly has pled guilty, and we had the factual basis at the plea.

However, my proffer would be that when Mr. McGavitt went to the property, they met in a barn. Apparently, during approximately ten to 15 minutes after the encounter began, a brother of the complainant knocked on the door of the barn and at that point no further contact occurred. There was kissing and hugging prior to this; however, there was no sexual contact. They did not have sexual intercourse, no oral sex, no any kind of sex.

At that point, that was the only contact between Mr. McGavitt and the complainant. He left the premises. He walked to his vehicle that was parked down the street, and that was the only time that he had ever encountered the complainant in person. So we would ask the Court, if the Court would be willing to entertain testimony, we would have that to offer.

With regards to the other objections that we filed, there's the enhancement for the sadistic nature of the -- one of the videos that was produced. We just ask the Court -- I certainly don't need the Court to review it,

11:54:54

but there is no mention of pain with regards to the complainant during the production or discussion of that photograph afterwards, in any of the discovery that I have received.

I would ask the Court to rule based on the definition that the Fifth Circuit has laid out that that's not a sadistic content. And the other objections, we would just stand on our written pleading at this time.

11:55:10

THE COURT: All right. Ms. Zack, what do you have to say about all of that?

11:55:28

MS. ZACK: Your Honor, first, I believe, as the Court has laid out, that the PSR is considered credible for purposes of this hearing. In addition to the allegations in the PSR concerning the sexual contact, the letter submitted to the Court by the victim lays out those instances in detail. There is no evidence or anything to make this Court believe that what the victim is saying is in any way an exaggeration, an enhancement, or anything else other than the truth. And the things that she says are so detailed and descript as to lend credibility to them.

11:55:49

11:56:11

Additionally, she even talks about a third-party that saw the defendant at outside youth group walking away, so this is -- the government believes wholeheartedly what the victim has put forward. The

11:56:29 11:56:47 11:57:07 11:57:27 11:57:46

defendant clearly has a right to say whatever he wants to this Court to the extent that the Court will allow him to, but the government believes not only did he engage in sexual intercourse with this child, or sex acts with this child that meet the definition, but he caused her to put foreign objects inside her body, into orifices that are considered sexual by definition, and that that is sexual conduct.

So I believe that even if the Court were to find that he didn't physically touch her, which I don't believe the Court will find, given what she's stated and what the evidence is, the fact that he caused her to penetrate her body with foreign objects which counts as sexual contact by definition, the penetration of the vagina with any foreign object, whether it be digitally or otherwise, counts. And she recounts several instances, including one in particular with a butter knife and a hair brush. So, either way, there was sexually -- sexual conduct that meets the definition.

As to this sadomasochistic enhancement, there doesn't have to be an outcry saying that there was pain. The Court can find, based on the objects that were caused to be inserted, that pain could happen. The victim does not have to say, It was painful. In their inherent nature it can be found to constitute sadomasochistic

conduct. So our position is as we stated in our response.

THE COURT: All right. Thank you, Ms. Zack.

I think with respect to the defendant's position, Mr. Thomas, that he did not have sexual intercourse with the complainant, I am going -- I am going to assume that he will testify to that effect.

MR. THOMAS: Yes.

THE COURT: But, I am going to find that he did have sexual intercourse with the complainant based upon the victim-impact letter, which I read, from the victim herself, in which she alleges two instances of sexual intercourse. So I think by a preponderance of the evidence standard, that has been proved.

So I am going to overrule your objections Number 4, Number 5, Number 6. With respect to Number 7, you objected to the including the pending state charge, which is unresolved at this point, and to which the defendant has pled not guilty. I am not going to consider that for any purposes in this case.

MR. THOMAS: Judge, I understand the Court's ruling. Just so that I can make sure I have preserved what I need to for Mr. McGavitt, would the Court accept my proffer that the defendant would testify to the facts that we -- that I described during my proffer?

THE COURT: That is -- that is what I am

11:59:29 11:59:52 12:00:06 12:00:18 12:00:27

saying, yes.

MR. THOMAS: Thank you, Judge.

THE COURT: Yes. All right. So having ruled on the objections, the Court adopts the presentence report, and these are the guidelines' findings: The total offense level is 43, with a Criminal History Category of 1. That yields a recommended guideline sentence of life in prison, supervised release from five years to life, a fine range from 50,000 to $500,000.00, restitution in an amount to be determined or agreed upon.

Is there an agreement with respect to the amount of the restitution, Mr. Thomas?

MR. THOMAS: Judge, I spoke to Ms. Zack just a few minutes ago. I saw that there was the ECF notice yesterday that was filed, but I, frankly, did not open the one containing restitution, and before today I didn't have any information concerning that. It may be something that I can agree on at some point, but I haven't even spoken to Mr. McGavitt about it yet.

THE COURT: We will leave that pending.

MS. ZACK: Absolutely, Your Honor, and I will get with defense counsel and hopefully we can come with a stipulated order in the next two weeks. If we can't, we will ask for a hearing, Your Honor.

THE COURT: All right. Very good. Thank you.

Let's see. The special assessment of $100 for each of the three counts --

THE COURT REPORTER: Judge --

THE COURT: Yes.

12:00:29 THE COURT REPORTER: -- Rhonda is saying they can't hear you on the phone.

THE COURT: Is that better, Rhonda? Can you hear me on the phone? I'm sorry, I had my face mask on.

So, let me -- let me continue. Let me know if you can't hear. 12:00:55

The restitution amount is going to be -- remain open at this point. Special assessment of $100 for each of the three counts to which the defendant pled; the $5,000 JVTA assessment on each count, I am going to -- I don't think I am going to impose that, in view of his indigence, and the restitution -- 12:01:14

MS. ZACK: Right.

THE COURT: -- amount that's been requested.

MS. ZACK: Thank you, Your Honor.

12:01:22 THE COURT: All right. So, based upon that, Ms. Zack, what do you have to say with respect to sentencing?

MS. ZACK: Your Honor, as a matter of order, how you want this to go. The victim has requested that her statement be read in court. Does the Court want me to do 12:01:35

that now, or do you want me to make my legal argument first? How does the Court wish to proceed?

THE COURT: I think statement first and then your legal argument will be good.

12:01:47 MS. ZACK: Okay. This is the statement written by the identifying victim in this case.

"I was 12, almost 13-year-old girl. My life was normal, full of sleepovers, school, and friends. After being home schooled for most of my life, I decided to 12:02:07 try online school. Little did I know that that would be the biggest mistake of my life. Following a teacher's instructions, I started to play Roblox" -- R-O-B-L-O-X -- "and there you were. You signalled me out, walked your Avatar up to mine, and said one word I would regret 12:02:27 responding to for years to come, the word 'hello.'

"A conversation began and continued for about a week. Then you demanded that an account be created. After trying Instagram, you landed on Facebook. You wouldn't let me see you. In fact, you told me that you 12:02:44 were about 30 to 35 years younger than you actually were.

"You became very demanding, and when I tried to back out, you began to threaten me. I was unnerved, but I still thought you were 16. That was a huge mistake. You asked me to call you after nonstop 12:03:04 conversation all day. I had brushed off the first threat,

not recognizing how serious it was. That night, I FaceTimed you. I ignored the feeling of panic rising up. When you answered the call, the light was off, and for one week after that, it stayed almost completely dark. The only light was from the TV, which you always had your back to, and the red flare of a cigarette and lighter."

Your Honor, I'm receiving word that they can't hear us on the phone. Is that still the case?

THE COURT: I don't know.

THE LAW CLERK: I don't know what to do about it. Hang up the conference and restart it maybe?

THE COURT: Let's try that.

THE LAW CLERK: Do you want to say that into the microphone, what we're going to do?

THE COURT: We are having difficulties with the folks on the phone not being able to hear what is going on. If they can't hear me, how do I tell them to hang up and start over again?

MS. ZACK: I am texting the agents. And I will text the victim witness, who will communicate to that.

THE COURT: Okay.

MS. ZACK: I am going to tell them to hang up and call back in.

THE COURT: We will try it again.

MS. ZACK: He said they did that.

(Conference call placed.)

THE COURT: All right. Let me ask.

PROSECUTOR: Oh, they say they can hear each other but they can't hear any of us.

12:05:37 THE CASE MANAGER: Okay. Now this is Rhonda. Now we can hear you, but we haven't heard anything for the last ten or 15 minutes.

MS. ZACK: Okay.

THE CASE MANAGER: And we have got a couple of victims and the victims coordinator and the special agent all -- and probation all on the phone. 12:05:53

MS. ZACK: Okay. Maybe, Your Honor, can I make a suggestion? Since I just started reading, maybe we just summarize that we went through the guidelines, the Court accepted the guideline calculation; that we have deferred restitution in the hope to agree within two weeks with defense, or we will set up a hearing; and that no one has made any arguments at this point about sentencing; and that I just started reading the statement, and I can start over. 12:06:09

12:06:29 THE COURT: Okay. Ms. Zack is reading the victim's impact letter, and she's going to restart that letter from the beginning.

MS. ZACK: Okay. Is that acceptable to --

THE COURT: So let us know if that is not acceptable, please. 12:06:44

UNIDENTIFIED MALE VOICE: Fine with us.

UNIDENTIFIED FEMALE VOICE: Fine with us.

THE COURT: Okay. Thank you.

MS. ZACK: Okay.

12:06:54 THE COURT: All right. Ms. Zack.

MS. ZACK: Thank you, Your Honor.

"I was 12, almost -- I was a 12, almost 13-year-old girl. My life was normal, full of sleepovers, school and friends. After being home schooled for most of 12:07:06 my life, I decided to try online school. Little did I know that would be the biggest mistake of my life. Following a teacher's instructions, I started to play Roblox, and there you were. You singled me out, walked your avatar up to mine and said one word I would regret responding to for 12:07:26 years to come, the word 'hello.'

"A conversation began and continued for about a week, then you demanded that an account be created. After trying Instagram, you landed on Facebook. You wouldn't let me see you. In fact, you told me that you 12:07:40 were 30 to 35 years younger than you actually were. You became very demanding; and when I tried to back out, you began to threaten me.

I was unnerved, but I still thought you were 16. That was a huge mistake. You asked me to call 12:07:55 you after nonstop conversation all day. I had brushed off

12:08:13 12:08:31 12:08:45 12:08:59 12:09:17

the first threat, not recognizing how serious it was. That night, I FaceTimed you. I ignored the feeling of panic rising up when you answered the call. The light was off. And for one week after that, it stayed almost completely dark. The only light was from the TV, which you always had your back to, and the red flare of a cigarette and lighter. You would barely talk. You would text on Facebook Messenger most of the time. I couldn't figure out what my problem was, but I wouldn't stop moving around. In fact, I tried to end the call because I didn't want you looking at me.

"Whenever I would get up, you would text me and tell me to sit back down because you said, 'I like to look at you.' I ended the call after that.

"At the end of that same week, while I was on the call, you asked me to take off my clothes. I refused and ended the call. But you said that if I didn't, I would be sorry.

"At that point, I knew that I had messed up. I didn't know how to delete the account, but I had convinced myself that I could handle this without anyone. You kept calling, and one night I answered again. The light was on and when I saw you, a kind of fear hit me that I cannot explain. I knew it was too late. You laughed at my reaction. The first word you said to me was 'surprise.'

"Over the next months you threatened my life. You told me that you would sell me. You told me that you wanted me dead. But when you wanted something of me, I was beautiful, pretty, and sexy. Almost everything you wanted from me was sexual. At 13 I was still trying to figure out what's normal for a girl. I was still coming to terms with my -- with me changing and getting older. You knew this and would tell me this was normal.

"I can't count the number of pictures you wanted me to send, or the number of videos. On FaceTime every single night you would ask why I was still clothed. And if I would build up the courage to try to fight back, whatever I would have to do that night would be worse than normal. I will never forget the night that I was supposed to put a butter knife in an area I won't mention because you said I had been a bad girl. I would cry, and you would sit on the other side of the screen and laugh.

"I couldn't get away from you. My grades were struggling because I had to talk to you 24/7. If I wasn't talking -- if I wasn't texting you, I had to be on a call. I couldn't even FaceTime my teachers for an online quiz. I was two months behind in school because I was texting you all day, and on a FaceTime all night. I would have to fall asleep at 1:00 a.m. and wake up at 6:00 for school. Within three months, the free, bubbly, carefree

girl that I knew myself to be became isolated, depressed, and suicidal.

"One night my brother couldn't sleep and he came knocking to my door and asked who I was talking to. I had to come up with a reason, but I already knew it was too late. From then on you started to tell me if I didn't do something, he would be hurt, too. You told me to make my parents sound abusive so that if anyone came across the chat, you would look like the good guy. I wanted to laugh when you said that because it was the most outrageous lie I had ever heard.

"I couldn't function anymore. I mentally and emotionally shut down. My parents and I started to fight over school and over stupid things. I would lock myself in my room, or the bathroom, and cry because I couldn't handle it. At night, I wasn't even allowed to shower without talking to you. I would pray every day for God to get me out of this situation alive, but when weeks would pass and you would ask me to go to strip clubs so that I would know how to do it properly, I became hurt and angry at God.

"As time went by I was plunged deeper and deeper into depression. I began to think the world would be a better place without me. Day after day, I was called road kill, a slut, a whore, a stripper, and many more.

"I needed a way out and I couldn't find one. I made up friends so I would have an excuse not to text you for a few hours so that I could do school. One day I was down at my swing set with my brother, and we were spinning each other around on the swings, when I checked messenger and saw three words and a picture that I can still see when I close my eyes. You said, 'I see you,' with a picture of the pond that we were no more than 200 feet from.

"I felt the color drain from my face. I told my brother we had to leave right then. When he questioned my panic, I made up a stupid excuse why we had to leave. I lived in fear for almost eight months. After four months, however, you said you were going to marry me. You wanted four kids from me. You were very specific: Three girls and one boy. I was scared to find out what would happen to the kids if I wasn't what you wanted.

"One day you called me and showed me wedding rings. I was so emotionally numb, I didn't even respond -- respond -- I didn't even respond. I just remember looking away with tears in my eyes knowing I couldn't cry because you would see it as a weakness. You would laugh whenever you would see me so scared that I wanted to cry for help.

"I began slitting my wrists. One night, I

12:13:51 had had enough. I pushed my leggings up to my thighs and made you watch me. With every cut, I would give you the reason I cut. I cut my legs 42 times that night. You told me that I would pay for what I had done. I had no idea that my punishment would be the source of my nightmares to this day.

"You tried several things to break me. The one that got close to breaking me was when you asked me to take a little glass bottle that I had used for a fairy 12:14:05 house when I was younger, dump the glitter that was in it down the sink. I was told to fill it with my blood instead. I held back tears with memories of my dad and I making that fairy house and how we laughed about how tiny we had made everything. I got so mad that I didn't talk to 12:14:23 you for a week.

"Two weeks after that you said you were coming to get me. You sent pictures of the road, as you drove. I planned to run away that Wednesday. I was going to leave. I was scared that you would find me and hurt my 12:14:37 family. I had my bag packed, and I went to youth group at the church.

"During worship I left, grabbed my bag, and got to the end of the block until I realized that I was scared of you hurting my family. But if I would have 12:14:51 let -- left, it would kill them. So I turned around and

started walking back. Through a big hole in the wood fence a hand appeared, palm up, as if you wanted me to take it. I decided to walk around it, and you grabbed me and pulled me through the fence. You raped me. You let me go in the parking lot, and my youth pastor even saw you walking back to the car.

"My dad came and picked me up. I kept my mouth shut. My eyes teared up as I watched you follow my dad's truck back to my house. I had to explain why I was struggling, but all I said was, 'School is stressful, and I can't handle it.' That was my silent scream for help.

"You called me that night and you had a great time, that you will be around for a while, and that you wanted to see me again. I started crying and cried myself to sleep that night. The next morning, I found that you had tried to come down our driveway and you had run off the road and gotten your truck stuck in the ditch. My dad helped you out of that ditch.

"The next day, I went to our barn to check on my rabbits. You dragged me by my arm into the room beside our stall and raped me again for 45 minutes. When you were done, you told me to 'Get the hell out of here.' When I was halfway across the barn on the way out, you asked if I wanted to go with you. I just shook my head. And the last thing I heard you say before I shut the door

was you say, 'I hope you are ready to be a mother.'

"I pretended to be pregnant for a couple of weeks so that I didn't have to do anything sexual. My -- I stole a pregnancy test from my mom because I was terrified that you had changed my life forever with a child. I told my parents, and a week later I was put in a behavioral hospital for my safety.

"You stole so much from me. You stole the experience of my first kiss. You stole my virginity. You stole my feeling of safety anywhere. We had to change churches. I had to deal with my youth pastor telling everyone that I lied about what had happened, and my children's pastor telling my best friend that I was mental, and needed to be treated differently.

"I didn't and still don't feel safe in my own home. I literally couldn't even be out in my front yard without going to the tree line and making sure you couldn't really see me if you were there. I had to earn every bit of trust back, which I am still working on a year-and-a-half later.

"An amazing guy has come into my life, but it took me three months to see the difference between torture and control and true affection and love. I feel like I have to look over my shoulder for the rest of my life. I want my life back. I want myself back. But

because that can't happen, I want justice to be served.

"Your sins and mistakes, I have to live with, but you will rot in jail for it. I am so glad that the Lord didn't bless you with a child from me. Being a dad is a blessing, whether a psycho dad or not. You don't deserve that joy.

"You can't control me anymore. I will live my life normally, and I will use my story to help others and prevent this from happening to anyone else. No one deserves what I went through, and I made sure you wouldn't do this to anyone else. You are finished, and I am free. I think it's time to celebrate. You may have made me fall, but you didn't break me. Remember that."

THE COURT: Thank you, Ms. Zack. All right. And your argument on sentencing?

MS. ZACK: Your Honor, the government's position is the defendant deserves to be sentenced to life in prison. The guidelines are at a 43 because they had to be reduced down to a 43, even with acceptance of responsibility.

The defendant's behavior is indescribable. The words that come to mind clearly are things like heinous, abhorrent, cruel, hateful, but nobody can say better what happened and how this affected the victim than she said. And as much as the defendant denies having

sexual contact, besides what the victim says, Your Honor, there are chats and Facebook messages between the two where after the sexual encounters, he's questioning whether she's pregnant. If they never had sex, how could she get pregnant?

He knows what he did, and he caused this child such pain, and this family such pain, that he should never have an opportunity to do that to any other family. He controlled this child's life for nine months. Every waking moment he wanted her attention. He used the Internet and a ruse to get her attention. He pretended to be somebody he was not, and by the time she figured out who he was, she believed she couldn't get away.

He made her insert foreign objects into her body. He made her -- he shamed her. He bullied her. He threatened her. He threatened her family. No 13-year-old should ever have to deal with those types of burdens on their own.

And often we hear arguments, Well, she could have told somebody, she could have done this, she could have done that. Well, she is under no obligation to do any of that. She is a child. The age of consent in Arkansas is 16. The defendant knew that. In fact, he had researched it. In the chats were the date of her 18th birthday because he believed they were going to get married

on her 18th birthday.

The torture that she endured, Your Honor, is -- we will never feel that kind of pain, hopefully, but knowing that he can never do this again to anybody else is the best thing that can be done for the victim in this case, for her family.

Under the 3553(a) factors Your Honor has to consider the nature of the offense, and the nature of the offense, I think, is very clear here. The characteristics of the defendant, Your Honor, I believe, that his manipulation and his use of the Internet, of ruses, of causing this child to shame herself, cut herself, become suicidal, certainly goes to describe the nature of the human being that stands before you.

He manipulated a child to fuel his sexual deviance. Whether he has a criminal history or not shouldn't matter at all because what he did is in and of itself enough to justify the sentence the government is asking for.

What message does that send to the public about respect for the law? I think absolutely the right message, especially in this day and age when most of our children are online going to school, because of COVID or by choice. Children are at risk for predators like this defendant every time they log on, and the public needs to

know that people that do this to children are being appropriately punished and taken off the streets.

There is -- I don't believe this would cause any disparity, Your Honor. I have been before this Court and seen this Court sentence others that have done similar things -- manipulated children, had sex with them, posted images online, and come into physical contact with them -- get sentences of 960 months.

Based on the statute here, though, the Court can impose a life sentence, any sentence up to life, from ten years, up to life. And 960 months, as the Court has done in the past, clearly is tantamount to life in this particular case.

Your Honor, I believe all the facts and circumstances here support a sentence that will prevent this defendant from ever coming into contact with the public, with children, with anybody else. He is a predator. There is no counseling in the world that can change who he is or what he is capable of, and unless he is in prison for the rest of his life, any other child that he has access to, whether virtually or in person, is at risk, and that is why the government is asking for a sentence of life, and that at a later date we will deal with restitution.

THE COURT: Thank you, Ms. Zack.

Mr. Thomas.

MR. THOMAS: Your Honor, thank you.

On behalf of Mr. McGavitt, Mr. McGavitt is a 46-year-old man standing before the Court, has acknowledged his wrongdoing, and has pled, and acknowledged the things that he has been charged with. He is a man with a 9th grade education with zero criminal convictions in his life. He's got a 9th grade education. He grew up here in the Pasadena area. His dad, an Army veteran, and his mother was a homemaker.

Your Honor, Mr. McGavitt, certainly recognizes and takes no issue with the online aspect of this case. Respectfully, to the complainant, there is -- has been no -- nothing produced to the -- our defense that says that the coercion occurred in the manner except for the statement of the complainant. And with respect to the complainant's ability and, obviously, right to say that, there is nothing that's reflected in the discovery that we have received that demonstrates that coercive nature of this situation.

And, certainly, Mr. McGavitt is a 46-year-old man, and was 45 at the time, certainly the complainant was 13, and I don't take away that it's the adult's responsibility to be an adult and that is certainly our position before this Court. However, to the extent

12:25:29 12:25:50 12:26:06 12:26:24 12:26:38

that those statements have been made, Judge, we just respectfully urge the Court to consider there is a different account of this. He certainly received the images. He certainly caused the complainant to produce them. We are not in any dispute about that.

Judge, Mr. McGavitt, if the Court was to consider a sentence within the range of the statutes at issue here, we would urge 15 to 20 years would be adequate to deter the defendant from future conduct and to take into account the serious nature of this offense considering the fact that he is a first offender. In 20 years Mr. McGavitt will be 66 years old. He will not be in a position to reoffend. He will be on, certainly, the strict conditions of supervised release if the Court would consider that. He certainly would be under the deterrent of a future -- any possible violation of those conditions would cause him to be rearrested and reimprisoned at a later date.

Your Honor, Mr. McGavitt -- he is remorseful for what occurred. He certainly has expressed that in the statement of the PSR, and I think he will express it again today in public. Based on all of these arguments, Judge, we respectfully request no more than 240 months be assessed in this case.

THE COURT: Thank you, Mr. Thomas.

Mr. McGavitt, you have the opportunity, if

you wish, to say anything that you would like to say prior to my determining your sentence.

THE DEFENDANT: I know I did wrong, Your Honor. I know I caused her pain and all that. I am really sorry for everything I ever done to her. I didn't mean it, but I take responsibility for it, what I done. I hope you will forgive me, Your Honor, and the state. I hope everything goes all right.

THE COURT: Thank you, sir. All right.

All right. The Court has considered the guidelines and all the 3553(a) factors and finds that a sentence within the guidelines is consistent with and takes into account all of the purposes of 3553(a). So therefore pursuant to the Sentencing Reform Act of 1984, it is the judgment of the Court that the defendant George Daniel McGavitt is hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of life as to Count 1, 360 months as to Count 2, and 120 months as to Count 3 to be served concurrently for a total term of life in prison.

Upon release from imprisonment, the defendant shall be placed on supervised release for a term of 15 years as to Counts 1 through 3 to run concurrently. Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the

probation office in the district to which the defendant is released.

While on supervised release, you must not commit another federal, state, or local crime, shall comply with the standard conditions that have been adopted by this court, abide by any mandatory conditions required by law, and shall comply with the following additional conditions.

You must participate in an education services program and follow the rules and regulations of that program. Such programs may include high school equivalency preparation, English as a second language classes, and other classes designed to improve your proficiency and skills such as reading, writing, mathematics, or computer usage. You must pay the costs of that program.

You must provide the probation officer with access to any requested financial information and authorize the release of that financial information. The probation office may share that information with the U.S. Attorney's Office.

Pursuant to 18, United States Code, Section 3583(d), you shall make restitution to the minor victim number one in an amount to be determined or agreed upon within the next 90 days. As part of this condition, you will adhere to the schedule of payments which will be

attached to the judgment. You must not incur new credit card charges or open additional lines of credit without the approval of the probation officer.

You must not have direct contact with any child you know or reasonably should know to be under the age of 18, not including your own children, without the permission of the probation officer. If you do have any direct contact with any child you know or reasonably should know to be under the age of 18, not including your own children, without the permission of the probation officer, you must report this contact to the probation officer within 24 hours. Direct contact means written communication, in-person communication, or physical contact. Direct contact does not include incidental contact during ordinary daily activities in public places.

You must not view or possess any visual depiction, including any photograph, film, video, picture, or computer, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means of sexually explicit conduct. You must not possess or use any computers or other electronic devices, or data storage devices, or media without the prior approval of the probation officer. If approved, you shall consent to the ongoing monitoring of all such devices. To ensure compliance with the computer monitoring, you must

12:30:36

12:30:49

12:31:03

12:31:14

12:31:30

also allow the probation officer to conduct initial and periodic unannounced searches of any computers subject to computer monitoring. These searches shall be conducted for the purposes of determining whether the computer contains any prohibited data prior to the installation of the monitoring software to determine whether the monitoring software is functioning effectively after its installation, and to determine whether there have been any attempts to circumvent the monitoring software after its installation.

You must warn any other people who use these computers that the computers may be subject to searches pursuant to this condition. You agree to pay the cost of the hardware and/or software monitoring system, including any ongoing monthly service costs, in addition, with your ability to pay as determined by the probation officer.

You must participate in a sex offender specific treatment program and follow the rules and regulations of that program. The probation officer will supervise your participation in the program, provider, location, modality, duration, intensity, et cetera, and you must pay the costs of that program if you are financially able.

You must not reside, work, access, or loiter within 100 feet of schoolyards, playgrounds,

arcades, or other places primarily used by children under the age of 18 or where children may frequently congregate, unless approved in advance in writing by the probation officer.

12:31:45 You must not seek or maintain employment, supervise, volunteer, or participate in any program, in any activity, where minors under the age of 18 could congregate, without prior written approval of the probation officer. This would include athletic, religious, 12:31:58 volunteer, civic, or cultural activities designed for minors under the age of 18.

You must have no contact with the victim or the victim's families -- victim's family, including letters, communication devices, audio or visual devices, 12:32:12 visits, or any contact through a third-party without prior written consent of the probation officer.

It is further ordered that the defendant shall pay a special assessment to the United States of $300 due immediately through the United States District Court, 12:32:26 Southern District of Texas. The Court finds that the defendant does not have the ability to pay a fine, and therefore the Court will waive a fine, and a schedule of payments will be attached to the judgment once an agreement on restitution is reached, or we have a hearing and the 12:32:41 Court determines the amount of the restitution.

I do need to advise the defendant of his rights to appeal. Mr. McGavitt, you can appeal your conviction if you believe that your guilty plea was unlawful or involuntary or if there was some other fundamental defect in the proceedings that was not waived by your plea of guilty.

You also have a statutory right to appeal your sentence under certain circumstances, particularly if you believe that your sentence is contrary to law. If you file an appeal in this case, it must be filed within 14 days of the entry of judgment. If you cannot afford to pay the costs on appeal, you can ask to proceed without paying the costs, and you have the right to have an attorney appointed to represent you on appeal if you cannot afford an attorney.

Now, do we need to dismiss any counts?

MS. ZACK: No, Your Honor. There is a final letter of forfeiture that I had e-mailed to Rhonda that she said she would print out for Your Honor to sign. It is just the same as the preliminary order of forfeiture that was signed when the plea was taken.

THE COURT: All right.

MS. ZACK: I don't believe there is any objection to it. It is just the forfeiture of those items that were in the indictment.

12:33:56 12:34:09 12:34:24 12:34:40 12:34:54

THE COURT: All right. Fine.

I do want to say for the record, that if I have misinterpreted or misapplied the guidelines in any way, that this is the sentence that I would apply considering the 3553(a) factors.

Are there any objections to the special conditions, Mr. Thomas?

MR. THOMAS: Not with regards to the conditions of supervised release. We would object to the sentence as being greater than necessary, considering the characteristics and history of the defendant, specifically that he does not have any criminal conduct which he has been adjudicated for prior to this incident, and considering that there was only online conduct and not physical, sexual contact between himself and the complainant. We would ask the Court to reconsider the sentence of life as greater than necessary.

And the second thing I would add, Judge, is that I do request a placement within the State of Texas.

THE COURT: All right. I'll make that request to the Bureau of Prisons, that he be placed in a facility within the State of Texas. That is only a recommendation. They are not required to follow that. And I understand your contention, but I --

PROBATION OFFICER REYES: Cynthia Reyes from

probation.

THE COURT: Yes.

PROBATION OFFICER REYES: Your Honor, we just need something on the record regarding the JVCA, a finding of indigence or something to that effect.

12:35:03

THE COURT: Okay. I think you missed that, but I did specify that I am not imposing that because I do find that the defendant is indigent, and --

PROBATION OFFICER: Okay. Thank you.

12:35:14

THE COURT: -- in view of the restitution amount that has been requested. So thank you for pointing that out, but I think that was part of time when you were not able to hear what was going on. Thank you, Ms. Reyes.

PROBATION OFFICER REYES: Thank you, Your Honor.

12:35:25

THE COURT: All right. Is there anything else?

MS. ZACK: Nothing from the United States, Your Honor.

THE COURT: All right.

12:35:28

MR. THOMAS: May I have just one moment?

THE COURT: Yes.

(Discussion off record between the defendant and his counsel.)

MR. THOMAS: Judge, that is all I have. Thank you.

12:35:38

THE COURT: All right. Thank you. We're adjourned then. Thank you.

(Concluded at 12:35 p.m.)

COURT REPORTER'S CERTIFICATE

I, Kathleen K. Miller, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Dec. 2, 2020 /s/ _Kathleen K Miller

Kathleen K. Miller, RPR, RMR, CRR